Good morning, Your Honors. My name is Kathy Milam, and I'm here representing the appellants, the defendants below in this case. This is a garden variety breach of contract case. It was a stock purchase agreement entered into between the appellants and the appellees for the appellants to purchase a meat processing factory. The appellants paid the appellees $32 million at closing, which was on April 1, 2001. There was a provision in the stock purchase agreement that allowed for an additional earn-out payment in the event that K&N, the $4 million, all the way up to a potential maximum of $7.2 million, depending on the level of financial performance of the company. Based on the actual financial performance of K&N, the appellants declined to pay an earn-out payment to the appellees, and this lawsuit ensued. The district court entertained summary judgment by the appellees and ruled as a matter of law that the appellants had breached the contract, ruled as a matter of law that the appellees were entitled to the maximum potential earn-out under the stock purchase agreement of $7.2 million. The district court also awarded prejudgment interest calculated from the date of the alleged breach, which was December 5, 2001, as well as an award of attorney's fees pursuant to an indemnity provision in the stock purchase agreement. The appellants believe that the district court misunderstood the law of New York on damages, and as a result of that misunderstanding, misapplied the summary judgment standard in this case and erred when it ruled as a matter of law that appellees were entitled to a judgment in the amount of $7.2 million. So with respect to that, what relief are you seeking from us? Do you want to remand it for a new trial on damages? We would like to have the summary judgment order reversed, remanded to the district court for trial on the issue of breach. No, I understand that. I was specifically asking about the damage aspect of it. I understand your argument on the liability, but as to damages, what are you seeking from us, if we're just focusing on that issue alone? Let's assume for the sake of argument that we found that the district court was right in granting summary judgment on the liability. What would you seek from us then in terms of remedy for the damage calculation? Well, we would ask that the case be remanded to the district court either to rule on the merits at trial on the issue of damages. Our preference, however, is to have the case dismissed to arbitration for determination of an earn-out payment, if any, that may be due pursuant to the contract, the stock purchase agreement, wherein the parties agreed to have any dispute with respect to the amount of the earn-out payment dismissed to arbitration. We've read your briefs, and we're familiar with the case. Any further questions? Thank you. You can save your time for rebuttal, and we'll hear from the other side. Please support John Lowry for the plaintiffs. I'm joined with my colleague, Mr. Skokin. Mr. Rico, one of the plaintiffs, is here as well. They were the owners of a closely held family business here in Seattle, K&N Beats. They were approached by a national food company, Alliant. That led to this purchase and sale agreement. The law here really isn't disputed. The contract says New York law. Both parties urged Judge Peckman to apply New York law, which she did. The facts are undisputed as well, at least the facts that mandate summary judgment. Let me talk about those first. There are five that mandate summary judgment. This case is a little unusual because normally when there's a contract, we say it's clear and unambiguous. They come in with evidence that says, oh, no, we helped write this contract, and we think it's not the right intent. Here, you have the testimony before you, uncontroverted, not only from the plaintiffs, but from the defendants who negotiated, who wrote, and who signed this contract. Both sides have said the same thing. This contract's clear and unambiguous. The spin that they're putting on it for litigation is just, frankly, not correct. And they're trying to urge on you an interpretation that they come up with in litigation, which is contrary to the interpretation that they put on the contract and the uncontroverted evidence that their witnesses put on the contract. So the five admitted facts that I'm going to talk about are admitted by the plaintiffs and admitted by the defendants from their own witnesses. First, the agreed purchase price of this company was $45 million, not $32 million, as Ms. Milam said, $45 million. And that was based on the existing business and this new nationwide grind operation where this national company was going to buy a whole bunch of equipment, grind beef, freeze it, sell it all over the country by migrating their customers nationwide to K&N, so that K&N has a market for this new ground beef. The earn-out portion of the $45 million is $7.2 million. We ask in discovery, we had a lot of problems in discovery. You probably saw that in the record. We ask in discovery, is it true that you believed, Alliant, that when you started operating K&N after we sold it to you, that they would operate it in a way to make the maximum recovery $7.2 million? They wouldn't respond to that request for admission. We had to go to Judge Peckman. We got an order compelling it. And she compelled the answer to this question. Admit that Alliant believed at the time it entered the agreement that K&N's operations would achieve the necessary level for plaintiffs to receive full compensation under the earn-out provision, $7.2 million. Well, let me just ask about that. Assuming we agree with you on the question of liability without saying that we do, why should you be entitled to the entire $7.2 million? If we look at the Windsor, New York case, which says, as I read it, and correct me if I'm wrong, that we ought to look to see whether or not there were other circumstances that would have caused the loss, in addition to the decision to terminate the grind and so forth, that the economy, et cetera, et cetera, that that should be factored in. What is your response to that? My response to that, Your Honor, is that that would undo all of the New York cases that we've cited and that Judge Peckman relied on. Those New York cases say that when you frustrate the condition, when you prevent the condition, you can't then rely on the non-occurrence of that condition as a defense. And if you allow a trial on what might have happened if they hadn't terminated, then you're just engaging in speculation as to ifs and what's and mights. What might have happened? What happened to the economy, assuming there was just a big depression all of a sudden? That's the risk you take when you breach a contract. When you breach a contract and prevent the occurrence, then you've prevented that occurrence, and you can't then rely on the non-existence of that occurrence. Yes, what if meat was declared illegal in the United States? Well, sure, let's litigate that. That's just speculation. And I wanted to – let me just – maybe this will answer it. I think Judge – excuse me. I think Judge Ezra had a question. Well, that's all right. If you're going to – Thank you. There's a case that we discussed in our brief that they really haven't talked about. It's the Koff-Lippmann case. It comes out of New York. It's a 1992 case. It's instructed because – It's cited in the brief. It is cited in the brief. Yes, Your Honor. It's a case that is instructed because I think it's very analogous to the facts here, and it also goes directly to your point and goes directly to several of the points that we're talking about. This is an airline brokerage case. The broker is hired by the subsidiary of a parent airline corporation to acquire some planes, and he's going to get commission on the sales. And there's going to be like six sales. So he does a bunch of work on it, and then just before they're going to try and close the deal, the subsidiary says, we want you to accept a lower commission. You're making too much money. He says, no, I have a contract. I want the commission under my contract. And so the subsidiary says, we're not going to submit the sale to the parent's board of directors. That's a condition of the sale is that the parent has to approve it. Well, we're not going to submit it to the parent. Therefore, the sale is not approved. Therefore, you don't get a commission. So they go and do the sale through another broker for apparently less money. So the broker sues and says, wait, I got a contract. You frustrated the condition under which I was to perform your approval. New York court says, you have an implied, and people, they admit this, I think, that New York implies the duty of good faith and fair dealing, and under that good faith and fair dealing, you have an obligation to refrain from doing something to prevent the other party from performing or, in this case, to prevent that party from getting the benefit of the bargain. And so they said, quote, a party's failure to act in good faith so as to facilitate the occurrence of a condition preceding requires the condition to be satisfied or excused, close quote. So they said, we're going to treat this as if that condition was satisfied. We're going to treat it as if the earn-out numbers were achieved. And the court went on to say in Coff-Lippman, quote, under New York law, a party injured by a breach of contract must be placed in the same economic condition as it would have been had the contract been performed. So I'm not going to penalize you for them having frustrated this. I'm going to put you in the same economic position as if it had been performed. In other words, I'm going to treat the condition of the earn-out levels as being satisfied. Well, let me stop you right there. Isn't putting someone back in the same condition as if it would be performed require that you determine what would actually have happened had it been performed instead of assuming that it would have been performed at its maximum earn-out? I think you would do exactly what you said. You would put them in the position as if it had been performed. If it had been performed here, the earn-out was $7.2 million. But doesn't that require you then to look at other circumstances, such as what would have actually happened? No. Why? Because, you see, in the case that you cited, there were no variables. What happened was the plane sales actually occurred. There was no dispute. They went the other way. It all happened. There was no question about it. But in this case, aren't there genuine issues, a material fact, with respect to whether, in fact, the earn-out would have been earned at all? Well, in the Kaufman case, the sales did not go through with the broker. No, I understand. Yes. So there was a clean case. But in this case, what happened was you had the substitution of the meat, they shut down the grinding operation, the frozen was shut down first, the other was shut down later. Then there was a big question about the economy and whether it would have happened anyway. But you're taking a breaching party who breaches knowing that that breach will prevent the condition. They knew that going in. There's only one way to make the earn-out, and that's to have a grind. So they know if I shut down the grind, impossible to meet the numbers. Impossible. They know that. So now you're saying they can breach, and the law in New York says if they breach, they cannot rely on the non-occurrence as a defense. But then they say, oh, I can't rely on the non-occurrence, but I want to litigate what might have happened. Why should we be put to the burden of litigating what might have happened based on their breach? As Judge Peckman says, they take the fall. Well, you're assuming that we would agree, and I don't know whether we will or not, that the district judge correctly interpreted New York law. See, that's one thing that the Court of Appeals looks at de novo is questions of law. When district judges like I make a decision, it's not due any deference. It has to be reviewed by the Court of Appeals de novo. And you say on the one hand, well, you know, they should just be entitled to the maximum earn-out. On the other hand, maybe the law in New York is that a party shouldn't get a windfall when they wouldn't have gotten it anyway. It would be a windfall, Your Honor, if this was on top of the purchase price. But this is a $45 million purchase price, which they withheld $7.2 million of. It's not like we're saying, gosh, we want more than we bargained for. We bargained for a $45 million sale. $7.2 was withheld. We sold the company. We didn't operate it. All these things that they want to talk about are problems and 9-11 and economy. That's nothing we had to do with. We had sold the company. Our only protection for K&N trying to make the numbers, since we're not operating anymore, our only protection is you've got to comply with the contract. And you've got to comply by buying the equipment. You've got to comply by migrating the customers. And you've got to do it for two years, not for six weeks. So you can't say, your company's worth $45 million. I'm going to keep $7.2 million to see what happens over the next two years, and then six weeks later say, I'm terminating the grind. I know you're not going to make it. I get to keep the $7.2 million of the $45 that I agreed to pay you. And now we're going to have some jury speculate as to, well, if I hadn't terminated, what might have happened? That certainly sounds to me like I'm relying on the non-occurrence of the condition that I prevented. Well, aren't you in a way arguing against your own position on the merits? Because doesn't that then raise the question of whether or not there was a genuine issue of material fact as to whether, in fact, there had been a breach for legitimate reasons, i.e., that your client had misstated the revenues and or whether the breach was due to some corporate decision that they weren't going to do a grind because they were concerned about E. coli bacteria and all of this stuff. Those are all flying around, those issues. And the judge said, well, you know, as far as I am concerned, those issues don't create a genuine issue of material fact. And the reason the judge said that, Your Honor, is the contract doesn't give them the right to terminate for that kind of problem, and that's not why they terminated. We went through several motions to compel. We went through a hearing on contempt. We had an order to show cause on contempt for them to answer the simple question, who terminated this grind and why? And the judge ordered them to answer it, and they didn't.  And their answer, it was the automatic implementation of this policy of U.S. Food that acquired us. And Ms. Milam stood up in open court and said, when Judge Peckman said, why was it terminated, she said, and I quote, there was no decision about whether a grinding operation was appropriate or not, whether it's legitimate or justified or reasonable or paranoid or whatever. It was just a company policy. That's why it was terminated, a company policy. So to now come along and say, oh, gosh, maybe we terminated it because of problems or because of some determination, that's not what they said. They said it was terminated for a company policy. There's no evidence in the record anywhere. This was terminated three days after U.S. Food Service acquired Alliant. There's no testimony anywhere in this record that there was any reason for terminating this grind operation, except for the company policy. Can I ask you a rhetorical question, if I may? Let's assume that the panel, and again, I'm not suggesting we will, but let's assume that the panel agrees with the judge on the merits but disagrees on the damages. What's the remedy? That's the same question Judge Thomas asked. Well, I think, Your Honor, I'd like to take one more run at you. No, no. Don't take any runs at me. Just answer that question. Your Honor, I think the remedy, obviously, if you conclude the judge committed error on the issue of damages, would be remand for determination of damages. Well, what about this issue that she raised about sending it to arbitration or mediation? First of all, that was never raised before Judge Peckman. She was never presented with that issue. They asked for the entire case to be sent to arbitration. This is a the arbitration provision is a number-crunching, bean-counter arbitration. If the earn-out period had ended, which it didn't, and if they had come up with numbers for that earn-out, which they didn't, and if our numbers disagreed with their numbers, which they didn't, because we never came up with numbers because the earn-out period never ended, if we had a disagreement over those numbers of the earn-out, then that goes to an accountant to determine. But we're not here talking about that. We're here talking about you prevented K&N from even having an opportunity, and, therefore, you have damages under the contract. At best, you have a trial as to those damages. Why is summary judgment appropriate on damages? I mean, it seemed to me that the district court simply said, well, we can't determine it with certainty, and, therefore, you're entitled to the maximum amount. Certainly, it could be a subject of expert testimony about what the likelihood of earn-out was under a set of hypotheticals. Economists do that all the time. Well, I think, again, Your Honor, that undercuts the entire line of New York cases that says, in every case we cited, the defendant who breached and who prevented the occurrence of the condition could go back and say, oh, yes, but, yes, I know I prevented you from getting the occupancy certificate because I engaged in the sit-in that prevented you from having a nonoccupancy certificate, but now let's litigate whether you would have gotten it if I hadn't done that. None of those cases talk about this what-if analysis. The difference between liability and damages. I mean, you may have a point on liability, but on damages, you say, all right, now let's find out how much you were actually damaged by this breach, if we assume that there was a breach and the breach caused damage. And I think your argument is it's a zero-sum game, that we get nothing or we get everything, right? Our position is we say it's exactly like Kaufman. We must be placed in the economic position we would have been in if the contract had been performed. Right. And how do we know that? How do we know? In other words, how do you know you would have had the earn-out? We know because both sides going in expected it. We know that because the plaintiff admitted, the defendant admitted, that they thought we would make the earn-out, that K&N would generate the numbers to make the earn-out. And we know that because when Kaufman, by the way, determined damages for the broker, they didn't say, the broker said, my commission is $2 million. My quantum merit, my expert testimony as to quantum merit of my efforts, $1.4 million. And the other side, I'm sure, could say, well, gosh, there's six contracts. Why don't you just give them one or two and not six, like they're trying to say, give them part of the earn-out but not the whole thing. Kaufman said, we've got to put you in the same condition you would have been if the contract had been performed. That's not the $1.4 quantum merit. That's the $2 million on your contract damages. And so what these New York cases are saying is put you in the same economic condition. If this condition had been performed, the damages are $7.2 million. It says that right in the contract. If they had not terminated, then we'd know what the numbers were. But they did terminate. I take your point. My question is why you don't believe that it's susceptible of expert testimony? I mean, obviously we'll never know with certainty, but certainly you can have testimony that starts with a certain economic assumptions. Well, there is no such testimony. The close of discovery, there's no expert on this issue from either side. Neither side came in. I think the reason is when the New York court says, I'm not going to let you defend your breach on the basis of what would have happened if you hadn't breached, that's what you're talking about. No, I'm not talking about that. I'm not talking about that at all. You can say that's true for liability, but then you say what are the approximate damages from the breach, and that's a different question. But to engage in that decision of what are the damages from the breach, you're saying, okay, let's look at what would have, could have, might have happened in the event there wasn't a termination. And that would be saying to Koff-Lippmann, how do we know you would have closed the sale? Yes, it did close later, but how do you know it would have closed? How do we know that your efforts would have made that happen? Probability analysis. I mean, you do a probability analysis, and, in fact, you did that because you had the proformers, and that's how you reached the number in the first place. This is what we expect to happen. Now, my guess is that under that analysis, you probably end up at the same place because you use your proformers to say, yes, here's our proof that everybody expected if this had happened. Well, there are some differences in the economy we want to defend that. To me, that's a damage issue, not a liability issue, perhaps. I'm not arguing with you. I'm just raising an issue to give you the opportunity to comment on. I understand, Your Honor, and I guess all I can say is we don't think that going through that analysis, we think that would contradict the New York law. That would give a windfall not to us. That gives a windfall to the defendant. I prevented this occurring, but I still get to defend on the basis that if I hadn't prevented it, I have an expert who says, gosh, 9-11, E. coli, what ifs, gosh, my experts, what do you think their expert is going to say? Huh, you wouldn't have made it. Why? Oh, the economy would have gone south. Nobody likes meat, whatever. Therefore, you wouldn't have made it. We're going to have an expert that's going to speculate as to what we would have made it. So now we're all sitting in an apartment. That's what happens in trials every day. We're all sitting in an apartment speculating over what might have happened if they hadn't breached. Why? I think this is where Judge Peckman came down. This is where the New York law comes down, I think. I don't see it in New York law. I see that on liability, but not necessarily damages. What's your best case on damages? Kaufman. They gave them the entire contract. That's the net result of it, yes. They gave them the contract damages, and all these other cases are doing the same thing. They're not saying you have to prove that you would have been able to perform in order to, and that's what they're saying here. You have to prove, defendant, that the company you sold and you don't operate anymore, they're operating the company. You have to prove that the defendant's operation of the company would have been sufficient to generate the numbers. You can't prove it outright because we terminated the grind and prevented it, but you now have the burden of coming in here and proving, convincing the jury, that we would have done a good enough job, and I think what Judge Peckman came down on and said, and she said this in her order, if you're going to create the uncertainty about the damages and you've got a contract that says 7.2, we're not going to put the burden on the defendant, on the plaintiff over here, to prove or to litigate that uncertainty. We're going to put it on you. One quick point, two quick points. The conflictment also applied predestined interest from the date of the breach, which is exactly what Judge Peckman did, and attorney's fees she awarded because the contract says,  Finally, there is an affidavit in the record that they cited to you from a Mr. Saffron, and we think that's inappropriate. Mr. Saffron was a witness they came up with late after the discovery cutoff. We asked them who knows about this contract. They identified a Mr. Patton. Mr. Patton testifies. He says they're totally wrong, so after the discovery cutoff, they came up with Mr. Saffron. Judge Peckman struck that affidavit. No error has been assigned to that. No appeal has been assigned to that, and yet they cite it to you. We don't think that's appropriate. So the only testimony really is from both sides is that the contract says what it is. Let me ask about Cuff. I know this is a district court case. There's no case in the New York Court of Appeals that you cited to Amy's, I guess, which said the active conduct of the conditional promise of preventing or hindering the fulfillment of the condition eliminates it and makes the promise absolute. That's what you're arguing here. Right. What was Amy's case about? I don't recall. Fair enough. I'll look it up. Thank you. Rebuttal. We agree with the court on the distinction between liability and damages. We haven't reached any decisions yet. I'm just raising questions, so. Yes. We don't necessarily agree that liability is a foregone conclusion, because there are a number of facts that we think are at issue here with respect to justification. How are we supposed to take it on this record? You didn't put on any expert testimony, and neither did the other side. So what was Judge Peckman supposed to do on damages? The discovery had closed. We did retain an expert and disclosed an expert, just to clarify the statement that we don't have an expert because we do. But in terms of justification, one of the key things that I think we tried to do in our briefing to the district court and also to this court is that appellees want to look at only what happened from December 5th, 2001, which was the point when Alliant finally decided to stop migrating its ground beef requirements to K&N. That's what they want to look at from there on out. They put the blinders on, and they don't want to see all of the things that happened in the eight months prior to that decision to stop migrating ground beef, including the failure of leadership at K&N within just almost days of the acquisition, the huge disappointment about this $1 million-based business that they relied on when they agreed to pay $32 million up front, that there was a $100 million-based business. Within eight months, it had dropped to $41 million. But doesn't the record show that you represented under oath that the decision to terminate the grind resulted because of USF's in-house policy? Isn't that in the record? There was much confusion over the interrogatory. Who made the decision to terminate the grind? Or why? Why? Because it was SFS's in-house policy. It was the in-house policy. And as we supplemented our record and as we continued to and ultimately amended our interrogatory answer, it was a corporate policy. There wasn't one single person who made a decision. It was a policy that was applied. And it was a policy that was applied not very well, as it turns out. And we've got a declaration from Mr. Pete Gianetti that talks about the difficulties of trying to wind down nationwide in-house grinding operations and the time it took to do that. It was a very imperfect process. The decision was made. The decision was made. And it was not made in a vacuum, Your Honor. But does it matter that it wasn't made in a vacuum? If we accept your version of events, I gather what we are is this. You made a decision to terminate it as a reasoned product of a nationwide analysis. So you terminated the line. And you have to accept the consequences for the breach, don't you? You prevented their performance. Regardless of the reason, don't you have to accept the consequences for the breach? I agree with that. I agree with that statement. And what we're trying to say is it's a complicated process. This company made the analysis that, yes, this was a business where the risks outweighed the benefits. Sure. But then that's an intelligent decision. And we say, all right, companies do breach contracts and say we will pay the damages because we think that paying out 7.2 is a less cost to us than continuing the grind operation nationwide. That's a calculus that can be made. But it doesn't mean you aren't liable for breach if you breach, right? Precisely. In fact, however, the grind didn't stop at Cannon. Only the ramp-up did. And just months down the road in July of 2002, the product liability concern came to pass. There was an E. coli contamination event at Cannon, and 7,400 pounds of meat were withdrawn from the market, a great financial loss to the company. So, again, was this a decision that was reasonable, unreasonable, or not? Probably in light of the original contractual commitment, yes. And maybe we have to concede breach. But it was also a decision, and it was implemented in an environment as of September, August of 2001, when it was apparent to individuals like Andrew Zafran that implementation of the grind at Cannon was already a failure. It was foundering. The leadership was foundering. The equipment wasn't in place. And, in fact, the product that was eventually ground was substandard. What difference does that make? Because a breach of contract is a breach of contract. It goes to justification. I know. But doesn't that ñ isn't that a little bit like what I hear all the time, guilty with an explanation? It's kind of ñ isn't that what you're saying? This is the record. These are all factual issues, which is why we believe that summary judgment on the issue of breach is inappropriate. But even given that there is ñ that that ñ But, counsel, I can see why the judge ñ you know, it's apparent to me the district judge got pretty frustrated with your client. And I can see why. Because you've conceded, virtually conceded to this panel, that your client may well have been guilty of breach. And yet, on the other hand, you continue to argue that maybe there's general, you know, issues of material fact with respect to breach. The fact of the matter is that the record is pretty clear that your client breached the contract, at least from my perspective. And you may have an explanation saying, well, gee, you know, they're really not bad guys, you know, and they did this for a good reason and they were worried about E. coli and they were ñ those may be very legitimate, understandable business concerns, as Judge Thomas indicated. But the fact of the matter is they signed a particular contract at a particular time and they're bound by their contract. Now, the damages issue is another issue. But with respect to liability, it appears your client made a business decision, as Judge Thomas indicated. Period. Well, be that as it may, I don't want to further belabor that argument, although we believe that there are justifiable reasons. Well, what's your best case under New York law that you can prevent performance with a good reason and escape the consequences of your action? Well, if you concede liability, there is ñ we agree with that. We agree that the cooler air rule applies to the extent that it's not justifiable breach. We agree with that. But we also agree that to go the next step farther and assume that nonperformance that interferes with a condition proceeding can automatically entitle the nonbreaching party to a maximum amount of damages and relieve it of its burden of proof, we disagree with that completely. So what damages ñ what damage figure did you argue to the district court? Pardon? What damage figure did you argue to the district court? Well, we actually didn't have an opportunity to really argue a damage amount. What we did and presented to the district court, in fact, was to take all of the very best projections that the plaintiffs had supported by declaration when they implemented the idea of this grind operation in terms of maximum grinding capacity, optimum profit margin, instantaneous national distribution, no problems with equipment, perfect case scenario. And we adopted each of those parameters and applied it on top of the actual financial performance of K&N during the earn-out period. We presented this evidence, and what we found was, indeed, if you'd started from a $100 million-based business and built up from there, yes, you'd probably trigger an earn-out payment. But when you take reality into account and you're starting down at a $41 million-based business or a $53 million-based business and superimpose the best-case scenario for this ramp-up of grinding on the reality, is you miss the target for even the minimum earn-out payment under the very best-case scenario that the plaintiffs have to offer at trial. And that's the evidence that we presented to the district court. So under the evidence presented, she had to choose between 0 and 7.2, right? Well, we say that there's no earn-out under the plaintiffs' best-case scenario. Okay. Any further questions? No, sir. Anything else you have? Thank you for your argument. I would like to apologize to Mr. Lowry for asking about a case that wasn't cited in the briefs but was found as a result of my chamber's research. I do apologize. There was no reason for you to know about it. Thank you both for your arguments. We will consider the case carefully, and it will be submitted. We'll proceed to the argument on the next case on the calendar, which is Industrial Customs.
judges: D Nelson, Thomas, Ezra